NOT DESIGNATED FOR PUBLICATION

No. 127,373

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CAVAN RAY BROWNLEE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE BROWN, judge. Submitted without oral argument. Opinion filed December 19, 2025. Affirmed.

*James M. Latta,* of Kansas Appellate Defender Office, for appellant.

*Kristi D. Allen,* assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., GARDNER and HURST, JJ.

HURST, J.: Cavan Ray Brownlee entered an *Alford* plea, explained herein, to one count of criminal aggravated kidnapping and two counts of aggravated indecent solicitation of a child, which resulted in a 260-month prison sentence. Before sentencing, Brownlee apparently regretted his decision and moved to withdraw his pleas—alleging he was pressured into entering the plea agreement. The district court denied Brownlee's motion but applied an incorrect legal standard to part of its analysis. On Brownlee's first appeal, a panel of this court remanded for the district court to reassess the motion applying the correct lackluster advocacy standard. Following the remand, the district

1

court applied the correct standard and again denied Brownlee's motion. Brownlee now appeals, arguing the district court abused its discretion in denying his motion.

Finding the district court applied the law correctly and did not otherwise abuse its discretion, the district court's decision is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2018, the State charged Cavan Ray Brownlee with two counts of aggravated indecent liberties with a child, four counts of criminal sodomy, and two counts of rape in case No. 18-CR-2060. Brownlee was represented by attorney, Chrystal, who was appointed after the preliminary hearing but before trial. Several years after the initial charges, in 2021, Brownlee entered an *Alford* plea to one amended count of criminal aggravated kidnapping and two amended counts of aggravated indecent solicitation of a child. See *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970) (allowing for entering pleas while maintaining innocence). In exchange for Brownlee's plea, the State agreed to recommend the high number on each count in the sentencing guidelines grid box and that Brownlee serve his sentence on the kidnapping charge consecutively to the first indecent solicitation sentence with the second indecent solicitation sentence to be served concurrently. Additionally, under the agreement, Brownlee was free to seek a dispositional departure, but the State would oppose it and request the presumptive prison sentence.

During the plea hearing, the district court explained the meaning of an *Alford* plea and that Brownlee was pleading "guilty pursuant to Alford." The district court asked Brownlee if he understood that when "an individual enters what we call this Alford plea, if the judge accepts that plea the individual is found guilty." Brownlee agreed he understood and would accept that result. Upon the district court's questioning, Brownlee also affirmed that he read both the Defendant's Acknowledgment of Rights and the Entry

2

of Plea documents; that he had discussed the documents with his attorney; and that he had no questions about the documents and fully understood them. He also agreed that the documents represented the plea agreement he wished to enter and that no one was forcing, threatening, or promising him anything to get him to plead.

The court then explained the rights Brownlee was waiving by entering the plea, and Brownlee verbally confirmed his understanding of the waiver. In summary, the court stated: "This is the bottom line, Mr. Brownlee, by entering a plea today there will be no trial. You will be found guilty based on that plea. You'll be giving up all defenses." Brownlee affirmed that he understood and that it was his intent to plead.

The court informed Brownlee of the sentencing range for the criminal counts to which he was pleading, including "aggravated kidnapping, that's a severity level 1 person felony, that carries . . . 147 months to 653 months in prison . . . ." The court also explained it could run the sentences consecutively, "[m]eaning you don't start any time on Count 2 until you finished all your time on Count 1, so on and so forth" and that the court was permitted to impose any penalty it felt was appropriate under the law. Brownlee affirmed his understanding. Brownlee agreed that he had not taken any alcohol, medication, or other drug that affected his ability to understand and make his decision and that he had no medical, physical, or mental health reason that would cause problems in understanding the hearing or making decisions. Brownlee affirmed that he was satisfied with the services of his attorney, Chrystal. He then entered an *Alford* plea to all three amended counts. After each statement of his plea, the court asked whether Brownlee understood he would be found guilty based on the plea—Brownlee affirmed each time.

After the State provided a factual basis for the convictions—including that the victim had contracted a sexually transmitted infection (STI) as a result of the crimes committed by Brownlee—Brownlee's attorney made no objection to the factual basis

3

other than noting that Brownlee tested negative for the same STI. At the conclusion of the plea hearing, the court found that there was a factual basis for the plea; that Brownlee freely, voluntarily, intelligently, and knowingly entered the plea; that Brownlee understood the nature of the charges and the consequences of the plea; and that he understood his rights and knowingly, voluntarily, freely, and intelligently waived those rights. The court accepted the plea. Pursuant to the plea agreement, the State dismissed the remaining counts.

*Motion to Withdraw Plea*

About one month after entering his pleas but before sentencing, Brownlee submitted a pro se motion to withdraw his pleas. In the motion, Brownlee argued his plea counsel failed to provide ethically sufficient representation to defend him; he was misled and coerced into signing a plea agreement the day before trial; and he did not understand the plea he signed. Brownlee claimed he was represented previously by two attorneys who told him he had a strong case and that one of them encouraged him to pursue a theory that a different individual committed the crimes. Brownlee alleged that Chrystal failed to communicate with him, lied to him, failed to contact his prior counsel, and never watched his recorded police interview. According to Brownlee, Chrystal was unaware that he took "several lengthy naps" during the interview. Brownlee claimed that Chrystal said she was not allowed to investigate the person Brownlee believed committed the crimes and failed to assert a speedy-trial objection. Brownlee alleged that Chrystal refused to investigate his case or use "a wealth of exculpatory evidence" and that in the three days before trial, Chrystal only focused on pressuring him to take a plea. Brownlee claimed that on the day before trial, Chrystal told him: "I can beat the rapes, but I can't beat the sodomies. You can either get two life sentences or you can sign this and get an out date."

4

Brownlee argued he only agreed to the plea after he was misled, coerced, and scared after Chrystal "grilled him with the threat of life in prison," which caused him to sign the plea. Brownlee claimed he did not understand the meaning of the plea and thought he was not pleading guilty. It was not until the parties discussed the STI during the plea hearing that he realized he "didn't have a clue what he signed." He claimed that "[a]ny statement[s] made to the court about understanding the nature of the plea he signed are false" and "were made under the pressure of coercion from his attorney and the fear of life imprisonment." He claimed he was not informed by the court regarding the maximum penalty that might be imposed at sentencing and that the court failed to make findings that there was a factual basis for the plea.

The court appointed new counsel for Brownlee, and Brownlee's new counsel filed an addendum to Brownlee's motion. The addendum provided additional allegations, including that:  Brownlee did not recall meeting with Chrystal between her appointment on or about February 24, 2021, and June 14, 2021; during the week prior to trial, Chrystal only met with Brownlee on one or two occasions for periods not exceeding ten minutes; and on the Sunday before trial, Brownlee had three visits. Brownlee alleged that two of the Sunday visits were with an assigned investigator for brief periods that included discussion of Brownlee's attire at trial. He alleged the third visit was with Chrystal and the investigator and that the visit lasted approximately two minutes and included no discussion of the plea agreement. Brownlee claimed that on the day of trial, Chrystal told him that portions of his case were essentially unwinnable and that before meeting with Chrystal, he had no knowledge of plea negotiations.

*Hearing and Denial of the Motion to Withdraw Plea*

Brownlee and Chrystal both testified at the evidentiary hearing on Brownlee's motion. Brownlee reiterated many claims he made in his motion and the addendum filed prior to the hearing. Brownlee testified that Chrystal met with him once or twice before

5

the jury trial setting for just a few minutes each time and described the visits as alleged in the addendum. He stated that during one of the visits, Chrystal mentioned that his moustache might have left a spot on the victim and briefly discussed the STI evidence.

When asked about their discussions regarding his potential defense, Brownlee testified that they talked about looking into the girlfriend of the person who they thought might have given the victim the STI as being a possible witness. However, Brownlee was unaware if Chrystal investigated the witness. During the hearing, Brownlee said Chrystal got some information from his daughter about text messages that might be helpful to his defense. Specifically, Brownlee testified that after he was jailed, his girlfriend sent a text message to his daughter that "the ones that set [him] up are the ones that stole [his] belongings," but Brownlee admitted he never personally saw the texts. Brownlee testified that Chrystal was supposed to obtain the texts from his daughter and that his daughter told him she sent testimony of his kids and the text messages to Chrystal. Brownlee said that he believed it would have aided in his defense and that when he asked Chrystal about the texts and other parts of the defense, Chrystal said something about saving the evidence for an "ace in the hole." After Brownlee's counsel moved to admit the text messages, the court decided that the record of Brownlee's testimony was available to the court for consideration but that the messages were inadmissible for lack of proper foundation and hearsay.

Brownlee also testified about T.B., the person Brownlee alleged may have committed the crimes. He stated that he witnessed the victim and T.B. together and put "two and two together" and that one of his prior attorneys told him T.B. went to jail because he was already on probation for trafficking a juvenile. Brownlee testified that he and Chrystal very briefly discussed the possibility that T.B. was in a sexual relationship with the victim. The court admitted a photo Brownlee identified as depicting T.B. and the victim looking "familiar" with each other. According to Brownlee, Chrystal and the appointed investigator told him they had tried to investigate T.B. with no results.

6

Brownlee next testified that when he confronted Chrystal about not knowing that he took naps during the interrogations she claimed to have watched, she responded that she fast-forwarded the videos. Brownlee mentioned that Chrystal dismissed his concerns about his speedy trial rights. When asked to list the items that he believed were exculpatory and could have been used for his defense, Brownlee stated the STI was the main one but also mentioned the text messages and T.B.—who was apparently also named in the text messages as the person who set him up and robbed his house.

Brownlee emphasized that Chrystal pressured him to enter the plea. He testified that while the jury was waiting and he was in the holding cell, Chrystal told him he would get two life sentences or that he could take the plea and get out in 13 years. Brownlee testified that Chrystal told him he "would not plead guilty" and the plea would "convert the sex charges to a kidnapping," but that after the plea, he learned Chrystal did not get rid of the sex charges. Brownlee said he told Chrystal that he did not have his glasses when presented with the plea agreement and that Chrystal may have read or explained some of it, but he did not recall. He testified that the discussion about the plea agreement lasted 10 to15 minutes and that he was freaking out after she told him he would get two life sentences if he did not plea. Brownlee said he signed the plea agreement in the holding cell on the morning of trial; that he never saw the agreement or discussed that type of document with Chrystal prior to that morning; and that he had not asked Chrystal to engage in plea negotiations and did not know she engaged in negotiations with the State.

Brownlee stated he did not sign the acknowledgment of rights document and did not remember the court discussing his rights with him during the plea hearing. He testified he did not remember being asked if he was satisfied with Chrystal's services but that he did not believe he would have said he was satisfied. He stated that if he did tell the court he was satisfied, "it would have been outta sheer—I don't know, pressure" and that

7

he was just trying "to get it over with." He also testified that he did not recall telling the court he understood the sentencing recommendation. In sum, Brownlee testified that the reasons why his plea was involuntary were hard to explain but that the morning before trial he faced pressure and devastation.

On cross-examination, Brownlee admitted to having numerous prior criminal convictions. Brownlee testified that in his felony case in Louisiana—to which he entered a plea—his attorney made the plea without his agreement. He admitted that in a previous Kansas case for felony possession of methamphetamine, he was advised of his rights and decided to enter a plea. Brownlee also admitted that he told the court he had no questions about the documents Chrystal presented to him on the morning of the trial and testified that he told Chrystal "yes" when she asked if he fully understood them. However, Brownlee reiterated that he could not remember sitting in the courtroom and answering the questions, stating he was "pretty devastated." Brownlee confirmed on cross-examination that he was not on drugs or taking any medications at the plea hearing and had no mental health problems or head injuries.

Chrystal testified next, stating that she had practiced as an attorney since 1992, mostly in criminal defense. Chrystal testified that she met Brownlee on March 2, 2021, when COVID protocols were still in place and likely met with Brownlee in person due to jail policy. An investigator hired by Brownlee's former counsel informed Chrystal about the case and brought her up to speed before she met Brownlee. Chrystal stated she learned from the investigator—and from Brownlee at their first meeting—that the defense strategy was to blame T.B. and that the negative STI test was part of their defense. Chrystal testified she had consulted a medical professional regarding Brownlee's negative test and was told that Brownlee could not have gotten rid of the infection without treatment; however, Chrystal told Brownlee that the State would likely argue that the STI went away in the months before Brownlee was tested. She stated she also told Brownlee they had no proof that T.B. had the STI.

8

Chrystal testified that she was aware Brownlee and his daughter believed that a prosecution witness—the woman who reported the sexual assault—was responsible for the burglary of his home after his arrest. However, Chrystal said there was no evidence to prove this theory. Chrystal also testified that despite Brownlee's claim, she had spoken to his prior counsel. She also denied lying to Brownlee about watching his interrogation or only watching portions of the interrogation. Chrystal said she played the video for Brownlee and fast-forwarded through the part where he was sleeping. Chrystal denied telling Brownlee that she was not allowed to investigate T.B.; that she needed to call someone about Brownlee's speedy trial rights before filing any motions; or that she planned to hold off on using any information as an "ace in the hole."

Chrystal said that she may have told Brownlee there was a chance at beating the rape charges but that the other eight charges were going to be difficult because each carried a life sentence. She stated that Brownlee did not ask for a plea offer until they got closer to the time of trial and she "really started putting things together and then [she] started talking to him about it." Chrystal stated she told Brownlee that the more she was looking into the case the more red flags were popping up. Chrystal texted the prosecutor on Sunday evening before the Monday trial was set to begin and asked to call about a plea offer. Chrystal said she met with Brownlee in person that evening and informed him of the offer. She testified that she told Brownlee the pros and cons of his case and that they discussed at length the evidence and various issues with their planned defenses.

According to Chrystal, she explained the plea offer to Brownlee during their meeting at the jail. She stated she brought her sentencing grid and explained the charges and their sentencing consequences, including the difference between a grid sentence and a life sentence—believing that the plea to a grid sentence would allow Brownlee the ability to have a life after prison. Chrystal said she received the plea agreement in writing on Monday morning but that she was able to discuss the contents of the plea agreement and the acknowledgment of rights documents on Sunday night because she had entered

9

thousands of plea agreements with clients in the past and knew what they would say. She could not recall if she showed Brownlee a blank copy of the acknowledgment of rights document on Sunday night—which she often did with other clients—but said she went over all the contents of what both documents would contain. Chrystal said she spent more than an hour with Brownlee but that she could not recall the length of their meeting on Sunday night.

When Chrystal left the jail on Sunday evening she did not have any concerns that Brownlee did not understand the plea offer. She stated that Brownlee did not ask any questions about the offer but told her he wanted to think about it overnight because it was a big decision and he had wanted to go to trial, but that he understood the concerns. She also testified that when she told Brownlee that if he was not going to plead, she needed to spend the rest of the evening preparing for trial and that he told her not "to work too hard on it."

Chrystal testified that on the morning of trial, she met with Brownlee in the holding cell behind the courtroom. She stated Brownlee told her that he was struggling with the decision and that she said, "I can understand that . . . it's whatever you want to do." Chrystal said she shared her opinion with Brownlee that the plea was a way to assure he would be able to have a life and a future but that it was his decision.

After Brownlee said he decided to take the plea, Chrystal testified that she suggested Brownlee do a *Brady* plea and explained it to him. See *Brady v. United States*, 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970) (guilty plea otherwise voluntarily and intelligently made with competent counsel is not invalid because the plea is motivated by a desire to avoid the death penalty or to obtain a lesser sentence). While Chrystal referenced the plea as a *Brady* plea, the district court referred to the plea as an *Alford* plea. An *Alford* plea is more commonly used when the person desires to plead guilty without admitting to the offense. See *State v. Taylor*, 266 Kan. 967, 969, 975 P.2d

10

1196 (1999) (discussing *Brady* and *Alford* but indicating *Alford* is more applicable to the situation when a person enters a guilty plea without admitting to committing the offense). The district court referred to the plea as an *Alford* plea, and so will this court.

Chrystal said Brownlee was able to read the plea agreement once it was in writing and that he never complained about not having his glasses or being unable to read the documents. Chrystal said she typically reads the plea agreement itself "word for word" before paraphrasing the last portion of the document relating to bond violations. She also stated that she typically paraphrases the acknowledgment of rights and goes over everything it says or means.

Chrystal also testified that on the morning of the trial, she negotiated with the State regarding the amount of time Brownlee would serve. She said she negotiated a better offer by getting the State to agree to recommend the third count be served concurrently rather than recommending all three be served consecutively as suggested by the prosecutor on Sunday night.

Chrystal testified that Brownlee understood he was pleading to one count of aggravated kidnapping and two counts of aggravated indecent solicitation of a child. She said Brownlee asked how he could plead to aggravated kidnapping, and she explained that he could plead to a "nonexistent" charge to make the plea happen. Chrystal said she also explained Brownlee's duty to register and his lifetime postrelease requirement. Chrystal testified that Brownlee never said he did not understand what was happening; that she never coerced or forced him to plea; that she never scared him other than by stating the facts of his situation bluntly; and that she never lied to him. She testified that she gave him no promises other than telling him she would file a departure motion and would try her best to get him less time. Chrystal said she was prepared for trial; her defense was ready; witnesses were ready; and that though she always feels that there is more she could have done in a case, there was nothing unusual about this case.

11

On cross-examination, Chrystal testified that she advised Brownlee that the plea agreement was considerably better than what he would face at trial. Chrystal also admitted that the first time she reached out to the State to discuss a plea agreement was the weekend before trial. When asked why she waited to ask the State about a possible agreement, Chrystal testified that once she set everything else aside and got into "trial mode" and focused only on Brownlee's case, she saw more holes and problems with the case.

*The District Court's Ruling and Sentencing*

After hearing the testimony and the parties' arguments, the district court announced its ruling from the bench. The court stated that under K.S.A. 22-3210(d)(1), "a plea of guilty or nolo contendere, for good cause shown and with the discretion of the Court, may be withdrawn at any time before sentence is adjudged."

In deciding whether there was good cause, the court stated it would use the *Edgar* factors as articulated in *State v. Edgar*, 281 Kan. 30, 127 P.3d 986 (2006). After purportedly applying the factors, the court denied Brownlee's motion, explaining it found no good cause to allow withdrawal of the plea:

> "And that's what I think happened here, is not being befuddled or overwhelmed. I think the Supreme Court of Kansas articulated this very well in the case of *Williams v State*, it's at 197 Kan 708, page 711, when it says every man charged with a crime is influenced by personal considerations, which may later not appear valid to him, but psychological self-coercion is not the coercion necessary in the law to destroy an otherwise voluntary plea of guilty.
> "At the most here we have that psychological self-coercion going on, I think what—we don't even have that, I think what we have is simply that buyer's remorse. I think if we put Mr. Brownlee back in the same situation he was—he was on the day this

12

plea was taken, he would do exactly the same thing, with that clarity of vision of the reality going on.

"I don't find that there is good cause shown and on the basis of all of that and will deny the motion."

The district court sentenced Brownlee to 226 months in prison for the first count of aggravated kidnapping with a postrelease supervision term of 36 months; 34 months in prison for count two of aggravated indecent solicitation with lifetime postrelease supervision; and 34 months in prison for count three of aggravated incident solicitation with lifetime postrelease supervision. Count two was ordered to be served consecutively to count one and count three was ordered to be served concurrently with the other two counts for a total of 260 months imprisonment.

*Brownlee's First Appeal*

Brownlee appealed the denial of his motion to withdraw his pleas on September 23, 2022, in appeal No. 125,817. Brownlee moved the court to grant a summary disposition based solely on the fact that the district court applied the incorrect legal standard in consideration of the first *Edgar* factor. The State filed a response agreeing with the summary disposition request. The panel granted the motion, reversed the ruling, and remanded the case to the district court "with directions to reassess the first *Edgar* factor under the correct standard and then exercise its statutory discretion," citing *State v. Herring*, 312 Kan. 192, 474 P.3d 285 (2020).

On remand, the district court held a hearing and admitted that in the prior hearing it had applied the incorrect standard for the first *Edgar* factor by using an ineffective assistance of counsel standard rather than the proper lackluster advocacy standard. The court explained that in preparation for the new hearing, it had reviewed the transcript of the evidentiary hearing regarding the argument and evidence. After hearing arguments on

whether Chrystal's advocacy was lackluster, the court restated the applicable law, noting again that a presentence request to withdraw a plea may be granted for good cause shown. The court listed the three *Edgar* factors, which it considered in its determination.

Regarding the first factor—defense counsel's competence—the court noted that both the quality of the representation leading up to the plea as well as the effect of the representation is weighed. The court stated that the defendant must demonstrate that the representation amounts to lackluster advocacy, "which is less to meeting a standard that [*sic*] the incompetence required to violate the right to counsel under the Sixth Amendment" to the Constitution. The court stated that caselaw did not clearly define "lackluster advocacy" but that the *Herring* decision provided that "lackluster" was defined as "'lacking energy or vitality, boring, unimaginative, et cetera.'"

The court then explained that "looking at the lackluster standard, the proper standard," it did not find Chrystal's performance lackluster:

> "[T]his is what I find with [Chrystal]. That she was thoroughly prepared. She had reviewed discovery. She testified that she was ready and prepared to go to trial; that she had her evidence and potential witnesses marshalled, ready to go; that she had discussed the case with the client; that she had an investigator assisting discussing things with the client, and had discussions with the investigators. Her reputation here in the 18th Judicial District Court is one of—one of the best criminal defense attorneys here in the district. My experience with her is she's thorough and effective, extremely logical, and good— just good strategy and good articulation and presentation of the defense. And based on those abilities, the governor recently in recognition of those appointed her as a district court judge.
>
> "So in this case, you know, I see where [Chrystal] advised, you know, to do a plea bargain. This was based on her thorough knowledge of the case. And in particular, as she started to prepare for the trial and put her case and presentation together, she started to develop concerns.

14

"I found her performance in this particular case—I'd characterize it with adjectives like effective, competent, reasonable, capable. I would characterize it as an excellent job, above average, top notch.

"Yes, there could have been different approaches tried, and perhaps different approaches might produce a different result. But I would liken this jury trial preparation to that of preparation for a wedding. If given enough time, it would never end."

Regarding the other two *Edgar* factors, the court found Brownlee made sworn statements that he read the plea, understood it, and discussed it with his attorney; that no one was forcing him; and that he was not under any mental or physical duress. The court noted that Brownlee's behavior during the hearing was very calm and that he did not appear to be nervous or under pressure or making a decision he had not thought through.

The court concluded Brownlee had "buyer's remorse" about the plea. The court believed that if put back in the same position, Brownlee would make the same decision. The court stated: "I do find that specifically this was not lackluster performance in any way, and I don't find any of the *Edgar* factors, and I will find that there's not good cause shown to set aside the plea." The court added that it would adopt its other findings from the previous plea hearing regarding the second and third *Edgar* factors.

Brownlee appeals.

DISCUSSION

On appeal, Brownlee contends the district court abused its discretion in denying his presentence motion to withdraw his plea. A defendant can withdraw a guilty plea at any time before sentencing "'for good cause shown.'" *State v. Frazier*, 311 Kan. 378, Syl. ¶ 2, 461 P.3d 43 (2020). The defendant has the burden of demonstrating good cause. *State v. DeAnda*, 307 Kan. 500, 503, 411 P.3d 330 (2018). As the district court correctly explained, courts consider the *Edgar* factors when determining whether a defendant has

15

shown good cause to set aside a presentence guilty plea: "(1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made." *State v. Edwards*, 309 Kan. 830, 836, 440 P.3d 557 (2019) (citing *Edgar*, 281 Kan. at 36). The court need not find every factor, so a finding of lackluster advocacy may provide adequate evidence of good cause to permit the defendant to withdraw a presentence guilty plea. *State v. Aguilar*, 290 Kan. 506, 513, 231 P.3d 563 (2010). Although these are nonexclusive factors—and the court may consider other factors to find that good cause exists—Brownlee only relies on the *Edgar* factors for his claims of error. See *State v. Macias-Medina*, 293 Kan. 833, Syl. ¶ 2, 268 P.3d 1201 (2012).

An appellate court reviews a district court's denial of a presentence motion to withdraw plea for an abuse of discretion. K.S.A. 22-3210(d)(1); *State v. Barber*, 313 Kan. 55, 58, 482 P.3d 1113 (2021). A district court abuses its discretion when its decision is: (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Barber*, 313 Kan. at 58. Brownlee bears the burden of demonstrating the district court abused its discretion. See 313 Kan. at 58 (putting the onus on the party asserting the error).

Brownlee does not claim the district court made an error of law through an incorrect legal standard or erroneous application. Thus, Brownlee must establish either that the court made an error of fact or that no reasonable person would have taken the view adopted by the district court. The district court commits an error of fact when its findings are unsupported by substantial competent evidence. *State v. Schaal*, 305 Kan. 445, 452, 383 P.3d 1284 (2016). Substantial competent evidence is such legal and relevant evidence that a reasonable person might accept as being sufficient to support a conclusion. *State v. Smith*, 312 Kan. 876, 887, 482 P.3d 586 (2021).

16

Here, Brownlee argues that the district court abused its discretion in denying his motion because he demonstrated that Chrystal provided lackluster advocacy; that he was misled and coerced into entering his pleas; and that he did not fairly and understandingly enter into his pleas.

1. *The First Edgar Factor: The District Court Did Not Abuse Its Discretion in Finding Brownlee Was Represented by Competent Counsel.*

Brownlee argues that Chrystal provided lackluster advocacy and thus he was not represented by competent counsel. Competency under the first *Edgar* factor is a different, and less stringent standard than the *Strickland* ineffective counsel standard. See *Herring*, 312 Kan. at 197 (discussing the difference between the *Strickland* test and the "less stringent" lackluster advocacy standard). To determine whether a defendant was represented by competent counsel under the *Edgar* factors, courts consider whether counsel provided lackluster advocacy. 312 Kan. at 197. No caselaw defines lackluster advocacy. 312 Kan. at 201. The *Herring* court referenced the difficulty facing courts because of the lack of a clear definition of lackluster representation but merely quoted to the panel's discussion of the meaning of the general terms "lackluster" and "effective":

> "'On the one hand, the dictionary defines "lackluster" to mean "lacking energy or vitality; boring, unimaginative, etc." Webster's New World College Dictionary 812 (5th ed. 2014). On the other hand, the dictionary defines "effective" to mean "having an effect; producing a result" or "producing a definite or desired result." Webster's New World College Dictionary 464 (5th ed. 2014).'" 312 Kan. at 197 (quoting *State v. Herring*, No. 118,648, 2019 WL 1413030, at *4 [Kan. App. 2019] [unpublished opinion]).

The overarching question, then, is whether Chrystal provided competent representation that the court would not characterize as lackluster. See *State v. Bilbrey*, 317 Kan. 57, 66, 523 P.3d 1078 (2023) (noting that the inquiry before the court on a presentence motion to

withdraw plea based on counsel's performance is "whether counsel's representation was competent.").

Based on the available guidance, this court will consider whether the district court abused its discretion in determining Chrystal's advocacy was not lackluster. In summary, Brownlee alleges that Chrystal's advocacy was lackluster because she did not meet with him enough before the plea agreement date; failed to investigate available defenses; and pressured him to take the plea agreement.

Brownlee testified that he met with Chrystal on three occasions at most. Brownlee described the visits as brief and testified that none of the meetings delved into the facts of his case. Brownlee also testified that he had two short visits with an investigator the day before entering the plea.

Chrystal did not identify the exact number of times she met with Brownlee but generally disputed Brownlee's characterization. Chrystal testified that she met with Brownlee on one day in March, several months before the November trial date. Chrystal also testified that she went through Brownlee's interrogation video with him before the plea agreement discussions, but it is unclear if that occurred at that March meeting or sometime later. Chrystal also testified that she met with Brownlee for one or two hours on the Sunday before trial. The testimony at the hearing indicated the jail imposed certain protocols because of COVID, although there was no elaboration on the protocols.

While Brownlee contends that Chrystal's meetings with him were insufficient, he does not explain why or how that affected Chrystal's representation. There is no evidence that more meetings would have resulted in better representation. Brownlee does not allege he was unable to provide Chrystal with information for his defense or that he requested meetings that she refused. Further, there was testimony, including from Brownlee, that he met with an investigator for the case. Chrystal explained that the

18

investigator would sometimes meet with Brownlee and then report to her. Even accepting that Chrystal sparingly met with Brownlee—that alone does not demonstrate lackluster advocacy.

Brownlee also contends that Chrystal provided lackluster advocacy because she refused to investigate possible defenses, downplayed the STI defense, and was unprepared for trial. Brownlee contends Chrystal "had no defense formed for trial as late as the morning of trial." However, Chrystal's testimony generally contradicts and refutes Brownlee's claims. Chrystal testified that she was ready for trial and had a planned defense. Notably, counsel elicited testimony from Brownlee that—months prior to entering the plea agreement—his case was set for trial and had to be continued due to Chrystal contracting COVID and having to quarantine. Brownlee admitted that at that time—despite the case heading for trial the following week—he had not raised any issues with Chrystal or her representation. Additionally, Chrystal testified that she had a defense planned related to the STI evidence, she had spoken to Brownlee's prior counsel, and she had spoken to the investigator about the case.

Chrystal also testified that she investigated circumstances surrounding Brownlee's contentions and the planned defense. She acknowledged that Brownlee's negative STI test result was a part of the defense and testified that she consulted a medical professional regarding the contraction and treatment of the infection related to the feasibility of the defense strategy. She also explained that she worried the State could easily refute the importance of Brownlee's negative STI test due to its timing and that she had explained that to Brownlee. Related to that defense, Chrystal testified that she talked to Brownlee about how they had no proof that the identified alternative potential perpetrator, T.B., had tested positive for the STI. Finally, Chrystal also testified that while she was aware Brownlee and his daughter believed that a State's witness—perhaps the woman who reported the sexual assault—was responsible for the burglary of his home after his arrest, there was no evidence to prove this theory.

19

She also denied lying to Brownlee about watching his interrogation and testified that Brownlee may have been remembering an occasion where she played the interrogation for him and fast-forwarded through the part where he was sleeping. She denied telling Brownlee that she was not allowed to investigate T.B., that she needed to call someone about Brownlee's speedy trial rights before filing any related motions, or that she planned to hold off for the purpose of using any information as an "ace in the hole."

Overall, the district court found Chrystal's testimony more credible than Brownlee's testimony. This court cannot reweigh the evidence or reassess witness credibility. *State v. Newman*, 311 Kan. 155, 159, 457 P.3d 923 (2020). Substantial, competent evidence supports the district court's finding that Chrystal's representation and advocacy were not lackluster and thus does not constitute an error of fact. Therefore, because he alleges no error of law, to succeed on his claim that the court abused its discretion in this finding, Brownlee must demonstrate that no reasonable person would have taken the view adopted by the district court. *State v. Ellington*, 314 Kan. 260, 261, 496 P.3d 536 (2021). He has not met that burden.

> 2. *The Second Edgar Factor: The District Court Did Not Abuse Its Discretion in Finding Brownlee Was Not Misled, Coerced, Mistreated, or Unfairly Taken Advantage of.*

Brownlee argues that he was coerced and misled into entering the plea agreement based on the lateness of the plea agreement, the lateness of Chrystal telling Brownlee about the significant flaws in the case, and Chrystal's alleged insistence that Brownlee should plead guilty. Brownlee does not allege that Chrystal provided inaccurate or misleading information about his case or the plea agreement. See *Macias-Medina*, 293 Kan. at 837 (explaining that the first question when considering this factor is whether counsel provided inaccurate or misleading information upon which a defendant bases a

20

decision to plead). Instead, he focuses on the timing of Chrystal's accurate communications.

While Brownlee first learned of the potential for a plea agreement the day before trial—which is a high-stress time—Chrystal testified that she met with Brownlee about the deal for one to two hours. According to Chrystal, after discussing the plea with Brownlee, he wanted to consider it overnight. Chrystal also testified that Brownlee said he was struggling with the decision on the morning of trial, and she told him it was his decision to make. This court agrees that the timing of the plea agreement discussion is not ideal, but the timing alone does not demonstrate that Brownlee was taken advantage of, coerced, mislead, or mistreated.

Although Brownlee contends he did not understand the plea agreement, his contention is contrary to his affirmative responses to the district court's inquiry and belies Brownlee's experience with the criminal justice system. Brownlee admitted that he had previously entered into plea agreements resulting in criminal convictions and thus had experience with the concept of pleading guilty to a criminal conviction. During Brownlee's colloquy with the court, he did not say he lacked time to consider the plea or misunderstood anything about it. When questioned by the court at the plea hearing, Brownlee confirmed he was not pressured or coerced and understood his rights.

Brownlee also argues that Chrystal failed to properly advise him on the merits of his case and contradictorily suggested that Brownlee faced an uphill battle but could also "beat many of the charges." Brownlee's testimony indicates the primary defense was the STI evidence and that he discussed it with Chrystal along with Brownlee's theories regarding T.B. as an alternative suspect and the author of the text messages. Brownlee does not suggest other defenses existed that Chrystal failed to discuss with him or that Chrystal failed to discuss the available defenses with him. Rather, this is an issue of

21

timing—Brownlee argues that Chrystal's late notification about her concerns with the defenses caused him to be misled or coerced.

However, the evidence does not establish that they first discussed the defenses the day before trial—just that it was the first time Brownlee realized the depth of Chrystal's concerns. While it is possible Chrystal more clearly made her assessment of the case known to Brownlee the night before trial, because as she admits that weekend is when she really dove in and identified the magnitude of the holes in the case, Brownlee does not provide any credible evidence of Chrystal's prior statements about the case defenses that her later revelations contradicted. In fact, Chrystal testified that she never told Brownlee that they could beat the charges, that any defense strategy was an ace in the hole, or that any particular outcome was promised.  Brownlee may have first realized the day before trial that his attorney had grave concerns about the likelihood of success at trial where he faced multiple charges that carried a life sentence—but he has failed to show that realization resulted from Chrystal misleading, coercing, mistreating, or unfairly taking advantage of him.

Brownlee testified that he did not ask for a plea deal and had always wanted to go to trial, and Chrystal's testimony confirmed that. Contrarily, Chrystal testified that she was prepared for trial; had witnesses ready; had the defenses established; and was ready to proceed. However, Brownlee's plan to go to trial and subsequent agreement to plea does not establish or even create a reasonable inference that Chrystal inappropriately pressured or coerced him to accept a plea agreement. On the eve of trial, Chrystal reiterated the seriousness of the charges Brownlee faced: "I just told him that, you know, if you go to trial and just you're convicted of one, it's a life sentence and just what the facts are, there's no guarantee you would ever get out." As the district court noted, Chrystal was honest with Brownlee about the seriousness of the charges. Brownlee's feelings of pressure in the face of a difficult decision—especially on the eve of trial while

22

facing potential life imprisonment—is natural and does not mean that Chrystal inappropriately exerted pressure.

Importantly, the same judge presided over the plea hearing and the motion hearing. See *Macias-Medina*, 293 Kan. at 839 (placing import on the judge being the same). This means that the judge who observed Brownlee agree that he understood the charges he faced; the terms of the plea agreement; the potential sentences he faced by agreeing to plead guilty; the rights he would waive by pleading guilty; and that he was satisfied with counsel's performance, was also the judge who heard Brownlee's testimony contradicting all of those assertions when he moved to withdraw his plea. That same judge concluded Brownlee's testimony at the plea withdrawal hearing lacked credibility in part because the judge recalled Brownlee's demeanor at the plea hearing. The judge explained that Brownlee was "calm and cool and reasoned," which is supported by this court's review of the transcript. The plea hearing transcript contains no indication that Brownlee was disruptive, upset, confused, or otherwise dissatisfied. That same judge also observed Chrystal at both the plea hearing and the withdrawal hearing and found her testimony credible. The district court was in the best position to make those credibility determinations, and to the extent that Brownlee asks this court to reassess those determinations, it cannot. See *Newman*, 311 Kan. 155, Syl. ¶ 1 ("[A]n appellate court does not reweigh evidence or reassess witness credibility.").

Substantial competent evidence supports the district court's determination that Brownlee failed to demonstrate that Chrystal misled, coerced, mistreated, or unfairly took advantage of him. Further, Brownlee has failed to establish that no reasonable person would have taken the view adopted by the district court.

23

3. *The Third Edgar Factor: The District Court Did Not Abuse Its Discretion in Finding that Brownlee's Plea Was Fairly and Understandingly Made.*

Brownlee argues he did not fairly and understandingly enter into the plea agreement because Chrystal failed to adequately explain to Brownlee that he would probably never leave prison whether he was convicted by trial or plea agreement. Yet he concedes that he faced potential life in prison without the plea agreement. The court notified Brownlee at the plea hearing of the sentencing range for the criminal counts to which he was pleading and explained it could impose any penalty it felt was appropriate under the law. The court's description included a potential range for the aggravated kidnapping of up to "653 months in prison." The plea agreement also outlines the sentencing range for each charge. While the district court imposed a lengthy sentence, the sentence is far less than Brownlee would have potentially faced at trial. Eight charges against Brownlee carried life sentences with mandatory 25-year terms, meaning had the jury found him guilty of just one of those charges he would have spent a minimum of 25 years in prison. And there was no guarantee he would only serve the minimum. Under Brownlee's plea agreement, he was sentenced to 260 months, about 21.5 years, and has the potential for earlier release for good time served. While he will be much older, his potential for release under the plea agreement is far greater than it would have been if Brownlee had been found guilty at trial of just one of the eight charges that carried a life sentence.

Lastly, Brownlee argues that he had inadequate time to consider the plea agreement. Brownlee discussed the plea agreement for more than an hour with Chrystal and then had the evening to consider his options. This court agrees that does not reflect a lot of time. Yet Brownlee never requested more time from the court. During the plea hearing, Brownlee repeatedly affirmed his understanding of the plea and his intention to plead to the amended counts. He also denied having any questions about the plea agreement or issues with Chrystal's representation regarding the agreement. The court

24

explained the rights Brownlee was waiving by entering the plea and ensured Brownlee understood the waiver. Finally, the court confirmed Brownlee was not facing any health issues or under the influence of any medications or intoxicants that would impact his ability to understand his decision.

In sum, substantial competent evidence supports the district court's finding that Brownlee fairly and understandingly entered into the plea agreement. The same judge that accepted Brownlee's plea held the hearing on his motion to withdraw. The court heard the testimony, weighed the evidence, and made explicit and implicit credibility findings. Finally, Brownlee has failed to establish that no reasonable person would have taken the view adopted by the district court.

CONCLUSION

On remand, the district court applied the correct legal analysis, made factual findings that were supported by substantial competent evidence, and made reasonable determinations under the *Edgar* factors based on those factual findings. As a result, it did not abuse its discretion in denying Brownlee's presentence motion to withdraw plea for failure to show good cause.

Affirmed.

25